### No. 9414.

#### CITY OF SHREVEPORT VS. RED RIVER AND COAST LINE.

A charge of wharfage dues for artificial facilities furnished by a city or town in order to promote the convenience of loading and unloading ships and other vessels, is not amenable to the prohibitions contained in secs. 8 and 10 of Art. 1 of the Constitution of the United States,

But such a charge will not be maintained and enforced unless it appears from the evidence that it rests on services rendered by the corporation to vessels or boats by means of wharves or wharfage facilities provided and maintained at the expense of the corporation, and by means of which the loading and unloading of boats or vessels is materially and specially facilitated.

Works by which the general commerce of a city, including the shipping, is benefited, will not justify a charge for wharfage against the owners of ships or other vessels.

APPEAL from the Civil District Court for the Parish of Orleans. Monroe, J.

*E. H. Randolph* and *H. L. Edwards* for Plaintiff and Appellee.

*W. S. Benedict* for Defendant and Appellant.

The opinion of the Court was delivered by

POCHÉ, J. Plaintiff seeks to recover $4409 04 as wharfage dues on several steamboats owned and operated by the defendant company, at

the rate of ten cents a ton for each boat landing at the river front of the city, from the 4th of August, 1882, to the 20th of May, 1883.

The grounds of resistance are substantially: that the charge is really a tonnage duty; that no wharfage facilities or conveniences are furnished by plaintiff; and that the amount charged is beyond a reasonable compensation. The defendant appeals from a judgment against it in the sum of $428 97, and plaintiff prays for an increase of the judgment to the amount sued for.

The contention that the claim involves a tonnage duty, levied in violation of secs. 8 and 10 of Article 1 of the Constitution of the United States, is virtually abandoned on appeal. The whole theory of plaintiff, and the wording of the city ordinance on which the claim is predicated, show conclusively that the demand is based on alleged wharf facilities and conveniences furnished by the city and used by the defendant's boats during the time claimed for.

The right of recovery in such cases depends upon the artificial facilities for landing, for receiving and discharging merchandise, furnished by the plaintiff for the use or advantage of the ships or vessels sought to be made liable for such duties.

A charge for the privilege of entering a port, or of remaining there, would fall within the scope of the constitutional inhibition. But a claim for services rendered in the shape of wharfage facilities is recognized in law and has been enforced by the courts. 2 Ann. 538, First Municipality vs. Pease; 30 Ann. 190, Ellerman vs. McMains; 32 Ann. 1293, Mayor and Trustees of St. Martinsville vs. Steamer Mary Lewis and Owners; Packet Company vs. Keokuk, 95 U. S. 88.

The pivotal question in this case involves, therefore, the existence during the time claimed, of wharves or other artificial facilities used by the defendant and provided and maintained at the expense of the corporation of Shreveport.

The undisputed facts in the record are: that the main or principal landing in Shreveport is in front of Commerce street, which borders on and runs along Red river, between Texas and Cotton streets, which run from the river to the interior of the town. Between those streets, for a distance of some 1200 feet, Commerce street, of the width of 132 feet, is rocked or covered over with cobble-stones; which work was made and is maintained at the expense of the city.

During the highest stage of water in the river, which lasts about forty days in each year, boats may and do land right at Commerce street, on which they discharge their cargoes and from which they receive their return freights.

· But during all other portions of the year, all water-crafts land and carry on their traffic on a sand-bar in front of said street, but many feet below its level, under an inclining bank of the river, or on the banks of a stream known as Cross bayou, which empties into the Red several blocks above the foot of Texas street.

The record shows beyond a doubt, and it is conceded by plaintiff as a fact, that during low stages of water the city furnishes no artificial means whatever to facilitate the landings of boats or other water-crafts, and that all merchandise and other property shipped or received by water are deposited on the ground at the landing; and are kept dry in wet weather by being laid on dunnage, composed of planks and timber furnished by the owners of steamboats themselves.

From that circumstance derives the theory of the judgment appealed from, as it holds the defendant liable only for the landings made by its boats during high water, at Commerce street.

At this point, we may dispose of plaintiff's prayer for an amendment of the judgment; it can find no sanction either in law or in the evidence before us. The argument that the defendant is liable for wharfage duties in low water, when avowedly no artificial facilities whatever are furnished by the corporation, because their freights are hauled over Commerce street, because they leave thereon their skids and other material, and because they enjoy at that time as well as in high water the fire and police protection of the city, needs but to be stated to expose its utter weakness and its absolute lack of foundation in law, reason or common sense.

The remaining, and in point of fact the vital, contention in the case hinges therefore upon the question as to whether Commerce street, paved or rocked as we have stated above, and used as a landing in high water by the defendant's and other boats, is a wharf within the accepted sense of the term. It is on that point mainly that the testimony is conflicting. Plaintiff's witnesses all concur in treating it as a wharf, · and defendant's witnesses are equally unanimous in denying the proposition. The witnesses on both sides all agree substantially on the facts, but the divergence comes out of their varied definitions of the terms wharf and wharfage facilities. They all agree that Commerce street is one of the principal thoroughfares of the city, bounded on one side by the river and lined on the other by a series of large stores and warehouses; that vehicles of all kinds and descriptions are constantly run over it, and daily bring to and from the stores thereon large quantities of cotton and every kind of goods and merchandise used and

traded for in commerce, as well to and from the steamboats as other points in the city, from and to railroad depots, and to and from the country. They all concur, as far as their means of knowledge extend, that the works by means of which the street, at that particular point, is rendered and made fit for constant use and passable at all times, were made by and at the enormous expense of the city; that it is maintained at the expense of the corporation, and that one-third of the original cost was charged to and paid by the owners of lots abutting thereon. The only point left open therefore involves the proper meaning of the terms wharf and wharfage facilities.

We adopt the definition suggested by plaintiff's counsel and given by Webster: A wharf is "a perpendicular bank or mound of timber or stone or earth raised on the shore of a harbor, river or canal, etc., or extending some distance into the water for the convenience of lading and unlading ships and other vessels." By Bouvier, a wharf is defined as "a space of ground artificially prepared for the reception of merchandise from a ship or vessel, so as to promote the convenient loading and discharge of such vessel." These definitions substantially agree with those given by other authors.

The essential requisite is an artificial construction which facilitates the loading or unloading of vessels or steamboats. Now, what facilities are afforded in this case by the works constructed and maintained at the expense of the city of Shreveport?

Whether they land in low water at the sand-bar, or in high water at Commerce street, the boats are tied to posts provided by their owners, and launch their stages to the river bank, on which their freights are deposited, using dunnage in either case when the condition of the weather or of the soil requires that precaution.

It will not be gainsaid that when he has thus delivered the goods or merchandise entrusted to him for transportation, the common-carrier has fully complied with his contract of affreightment, whether the delivery takes place below on the sand-bar or above on Commerce street.

The only difference is felt in the hauling; from Commerce street it is shorter, and in muddy weather it is facilitated by the cobble-stone pavement. But, as to the common carrier, the evidence discloses no difference; and we have failed to discover any enhanced facilities afforded to him by the works which plaintiff erroneously holds out as wharf facilities, unless it be in the means of approaching his landing.

We conclude, and we therefore hold, that those works contribute to enhance the general commercial facilities of the city of Shreveport;

but that they do not materially add "to the convenience of lading and unlading ships and other vessels" at that port.

This record, in our opinion, presents the attempt of a corporation to charge and collect wharfage "for the use of that which is not a wharf, but merely the natural and unimproved shore of a navigable river." Such pretentions have always been discountenanced by the courts. Cannon vs. New Orleans. 20 Wall. 577; Packet Company vs. Keokuk, 95 U. S. 88.

Hence the city has no power or authority to charge wharfage duties on the grounds set forth in this suit; and the judgment appealed from is therefore erroneous.

Concluding, as we do, that steamboats are not specially benefitted by the works erected on Commerce street, and that their owners cannot be charged therefor simply because they are incidentally facilitated in their trade in common with the balance of the commerce at Shreveport, we are not concerned with the question of the character or rate of charges made by the city in the premises.

The judgment rendered in favor of plaintiff is therefore annulled, avoided and reversed; and plaintiff's claim is rejected and her action is dismissed at her costs in both courts.

Rehearing refused.

### DISSENTING OPINION.

FENNER, J.   The reasons given by the district judge for his judgment in this case are satisfactory to my mind and supported, it appears to me, by the law and the evidence.

I think his judgment should be affirmed and, therefore, dissent from the opinion and decree herein.